**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| THOMAS KYLE,<br><br>*Plaintiff*,<br><br>v.<br><br>NORFOLK SOUTHERN CORPORATION,<br><br>*Defendant.* | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Case No. 1:22-cv-00650<br><br>Judge Jeffery P. Hopkins |

# OPINION AND ORDER

Thomas Kyle ("Plaintiff" or "Kyle") was employed by Norfolk Southern Corporation ("Defendant" or "Norfolk Southern") for nearly fifteen years. In 2021, Kyle's Type II diabetes led him to take extended medical leave for about six months. Upon his return, about five weeks later, Norfolk Southern fired him from the company after an investigation concerning Kyle's handling (or mishandling) of an employee's railroad injury. Kyle sued, claiming disability discrimination and failure to accommodate his disability under the Americans with Disabilities Act of 1990 (the "ADA") and Ohio law. Norfolk Southern now seeks summary judgment, and Kyle opposes. Docs. 18, 20. For the reasons provided below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion for Summary Judgment (Doc. 18). The Court will set this matter for telephonic conference by separate entry.

## I. FACTUAL BACKGROUND

On July 9, 2007, Kyle was hired as a conductor trainee by Norfolk Southern, a transportation company specializing in freight railroading. Doc. 17-2, PageID 115; Doc. 17-5, PageID 174. During his nearly fifteen-year employment with the company, Kyle worked

as a conductor trainee, conductor, and engineer before the company promoted him to the position of terminal supervisor on November 1, 2020. Doc. 17-2, PageID 115. As part of his new role, Kyle oversaw train operations and ensured that company employees followed safety rules and practices in order to prevent railroad injuries. Kyle Dep., Doc. 17-1, 40:11–14; 96:20–25; Doc. 17-5, PageID 174. Notably, the events giving rise to this litigation occurred while Kyle served as a terminal supervisor from 2021 to 2022.

**A. Kyle's 2021–2022 Medical Leave**

Kyle's physician, Katrina Fernandez, recommended that he take leave from work due to his "largely uncontrolled" Type II diabetes in June 2021. Kyle Dep., Doc. 17-1, 22:22–25; 23:9–13; 26:1–25. Based upon her recommendation, Kyle spoke with Terminal Superintendent Derrick Green ("Green") about his interest in taking time away from work "for a few days" to receive medical attention. *Id.* at 45:11–25; 46:1–7; 47:1–8. In response, Kyle asserts that Green told him to resign from his position, if he could not handle the job's pressure and stress. *Id*. After Kyle refused to resign and said he would consult legal counsel, Green agreed to arrange Kyle's medical leave. *Id.* at 61:19–25; 63:14–21. Shortly thereafter, Kyle received an email from Norfolk Southern Health Services with instructions to apply for leave electronically. *Id.* at 65: 16–25. Following several delays (due to Kyle's own failure to submit the necessary paperwork), he submitted the required medical documentation to Norfolk Southern's Health Services and was approved for leave under the Family and Medical Leave Act ("FMLA") on August 11, 2021, for the period extending from June 25, 2021, through August 28, 2021 (roughly nine weeks). Docs. 17-9, 17-10, 17-11, 17-13.

On August 26, 2021, Kyle's physician recommended that the company extend Kyle's medical leave. Doc. 17-14. An extension was then approved by Norfolk Southern's Health

Services on September 13, 2021, which extended Kyle's FMLA leave until its exhaustion on September 16, 2021. Doc. 17-15; Doc. 19-4. Also, on September 13, 2021, the Division Superintendent David Stinston ("Stinson") received two email notices from the company's FMLA coordinator concerning Kyle's leave. *See* Docs. 19-4, 19-5. The first notice (Doc. 19-4), with the subject line "Benefit Exhaust," advised Stinson that Kyle's "protected leave entitlement for [his] leave of absence . . . [would] exhaust under the . . . Family and Medical Leave Act on 9/16/2021" and that no responsive email was required. The second email (Doc. 19-5) sent the same day, with the subject line "Continuous-Family Medical Leave Determination" provided that Kyle's 12-week leave request had previously been approved for continuous leave because of Kyle's "Serious Health Condition" for "Self." The email also stated that no response was required. Doc. 19-5.

As noted, September 16, 2021, marked the end of Kyle's FMLA leave period. Doc. 19-4. However, Kyle's use of Norfolk Southern's salary continuance program allowed him to receive full pay and benefits from the company for roughly three more months or until December 22, 2021. Docs. 17-16, 17-17, 17-18; Kyle Dep., Doc. 17-1, 133:12–24. On December 17, 2021, Kyle's physician stated in a letter that Kyle could "return to work on Wednesday, December 22, 2021." Doc. 17-19, PageID 248. On January 6, 2022, Norfolk Health Services memorialized that message in an email to Terminal Superintendent Christopher Andrews ("Andrews") and other company employees, stating that Kyle was "medically qualified to return to work with no restrictions." Doc. 17-20, PageID 249; Doc. 17-2, PageID 115. Kyle returned to work the next day—January 7, 2022, after a period of approximately six months of leave time. Kyle Dep., Doc. 17-1; 100:6–25.

**B. Kyle's Complaints to Management Following His Return**

Kyle asserts that, after returning to the office, he worked long hours that left him exhausted and caused his health to decline. *Id*. at 99:5–22; 100: 2–5. He then asked Terminal Superintendent Andrews and the Assistant Terminal Superintendent and immediate supervisor, Darin Hershiser ("Hershiser"), for assistance at the Middletown terminal. *Id*. at 99:5–23. He stated to them that he was working very long hours at the company's Middletown location and needed relief at night so that he could get adequate rest and avoid another period of medical leave. *Id*. at 106:11–15; 128: 7–11. Kyle also states that he specifically sent an email to Hershiser, the Assistant Terminal Superintendent and his immediate supervisor, expressing similar concerns in writing. *Id*. at 108:1–3. In turn, Andrews generally responded that the company would see what it could do and that he would try to find someone to assist Kyle at Middletown, according to Kyle. *Id*. at 110:8–14. However, Kyle contends that the company failed to provide him with any assistance. *Id*. at 110:20–25.

**C. Conductor Stacy Nicodemus' Injury and Subsequent Investigation**

Central to the parties' dispute in this action is the date on which Kyle first learned of a conductor's railroad injury—either January 27, 2022, or February 11, 2022. The relevant date is important because Norfolk Southern alleges that it ultimately terminated Kyle for failing to timely report the conductor's injury to management pursuant to the company's Safety and General Conduct Rules. Doc. 17-6, PageID 177–78 ("Every accident resulting in injury, death or damage to property must be reported to the proper authority by the quickest communication available."); Doc. 18-1, PageID 274.

The following events led to an investigation and (allegedly) Kyle's termination from Norfolk Southern. On February 11, 2022, Conductor Stacy Nicodemus ("Conductor

Nicodemus") reported that, while operating a switch on January 27, 2022, his hand slipped from the switch arm because of frost. Doc. 17-21. Conductor Nicodemus stated that he told his "supervisor" (without specifying a name) at approximately 6:00 a.m. on January 27 that he did not believe anything was wrong, that he had probably "bruised" himself, and that he would report any further problems. *Id*. In the same February 11, 2022, report, Conductor Nicodemus stated that he specifically told Kyle, the plaintiff in this action, that his injury was "still bothering" him on February 11, 2022, and then declined any treatment for it. *Id*. That same day, Kyle notified Terminal Superintendent Andrews of the conductor's injury. Kyle Dep., Doc. 17-1, 163:3–24. Andrews then contacted Division Superintendent Stinson, and they traveled to Middletown to investigate the incident. *Id.* at 161:10–13.

Kyle also participated in the investigation, leading an interview with Conductor Nicodemus and then drafted a report himself. Doc. 17-24. In his report, Kyle stated that Conductor Nicodemus reported that his elbow was in pain back on January 27, 2022, but that the conductor refused medical care on that date when Kyle asked him. Doc. 17-24, PageID 255 ("On the 27th when I asked when the injury occurred, he stated a couple weeks prior to that and didn't give me an exact date . . ."). Kyle further stated that on January 27, 2022, Kyle "did not notify anyone" about the injury because Conductor Nicodemus had "refused any treatment" and because he did not "report any switch . . . being an issue." *Id*.

Kyle later testified, however, that Conductor Nicodemus did not report an injury to him on January 27, 2021, at all; that his statement in the February 11, 2022, report was completely incorrect, and that Kyle first learned of the conductor's injury on February 11, 2022, when he drafted the report. Kyle Dep., Doc. 17-1, 165:1–25; 167:1–25. On February

11, 2022, Kyle was placed on administrative leave after completion of the investigation. Doc. 17-22, PageID 252.

**D. Kyle's Termination**

The same day, Division Superintendent Stinson recommended Kyle's termination in an email sent to Norfolk's Southern General Manager Kraig Barner ("Barner") and other leadership staff at the company. *Id.* at PageID 251–52. Stinson's email provided, in relevant part:

> On Friday, February 11, 2022, Middletown, OH Conductor Nicodemus reported an Injury to Terminal Supervisor Joe Kyle at approximately 08:15am that was from an injury that occurred on 1/27/22. After a thorough investigation is [sic] was discovered that the Injury was in fact reported to Mr. Kyle on January 27, 2022.
>
> The alleged injury occurred from aligning a switch and the employee injured his elbow. Mr. Kyle failed to notify his immediate supervisor and also failed to thoroughly investigate this incident to prevent another employee from a potential injury . . . Based on his lack of integrity due to failing to properly investigate an employee Injury and extremely late reporting, dismissal is recommended.

Doc. 17-22, PageID 251–52 (cleaned up). General Manager Barner replied to the email supporting Kyle's dismissal, stating the following:

> Not only did [Kyle] fail to investigate said injury, he failed to escalate to his supervisor and failed to report the injury as we are required to do when it was 1st reported on 1/27 . . . I support dismissal in this case.

*Id*. On February 15, 2022, Kyle met with Terminal Superintendent Andrews, who gave him a termination letter prepared and signed by Division Superintendent Stinson. Compl., Doc. 1 ¶ 35; Doc. 17-23. The letter stated that Norfolk Southern was terminating Kyle from his Terminal Supervisor position because it had "lost confidence in [his] ability to effectively perform the duties of [his] position." Doc. 17-23, PageID 253. The termination ended Kyle's nearly fifteen-year career with Norfolk Southern. Doc. 17-2, PageID 115.

## II. PROCEDURAL BACKGROUND

Kyle filed suit against Norfolk Southern on November 9, 2022, alleging disability discrimination and failure to accommodate under the ADA and Ohio law.[1] Norfolk Southern answered on March 13, 2023, and moved for summary judgment on November 15, 2024. *See* Docs. 8, 18. In the Motion for Summary Judgment, Norfolk Southern argues that Kyle cannot establish disability discrimination because the relevant decisionmakers in Kyle's termination did not know of his disability and because the company terminated him for failing to report an employee injury, not for any discriminatory reason. Defendant further argues that Kyle's failure-to-accommodate claim fails because he received all the medical leave he requested. *See* Doc. 18-1. Kyle responded. He asserts that management knew of his medical condition and extended leave, that the timing of his termination supports an inference of pretext, and that his termination effectively denied him a reasonable accommodation. *See* Doc. 20. Norfolk Southern replied. *See* Doc. 21. The matter is now ripe for adjudication.

## III. LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "'always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In deciding a motion for summary judgment, the Court

---

[1] This case was reassigned from Judge Douglas R. Cole to the Undersigned for all further proceedings on December 21, 2022, by then-Chief Judge Algenon L. Marbley. *See* Doc. 5.

must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

The non-movant cannot defeat summary judgment merely by pointing to any factual dispute. Indeed, the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). A fact is *material* if its resolution affects the outcome of an action, and a dispute is *genuine* if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. At bottom, the Court must determine whether there is some "sufficient disagreement" that necessitates submitting the matter to a jury. *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52).

## IV. LAW AND ANALYSIS

Kyle seeks relief from Norfolk Southern and asserts two claims: disability discrimination and failure to accommodate his disability in violation of the ADA and Ohio Revised Code § 4112.02. *See* Compl., Doc. 1. Norfolk Southern seeks summary judgment as to both claims. Doc. 18.

### A. Disability Discrimination

The Court turns first to Kyle's claim for disability discrimination. For this claim, Kyle alleges that Norfolk Southern discriminated against him because of his Type II diabetes in violation of Ohio Rev. Code § 4112.02 and the ADA. *See* 42 U.S.C. § 12101. "Ohio's

disability discrimination law 'parallels' federal law" and so, "the analysis is the same." *Dixon v. Exel, Inc.*, No. 2:24-cv-1891, 2026 WL 592212, at *10 (S.D. Ohio Mar. 3, 2026) (citing *Belasco v. Warrensville Heights City Sch. Dist.*, 634 F. App'x 507, 514 (6th Cir. 2015)). To establish a prima facie case, Kyle must demonstrate that (1) he has a disability, (2) he is otherwise qualified for the job "with or without reasonable accommodation," (3) he "suffered an adverse employment decision," (4) Norfolk Southern "knew or had reason to know" of his disability, and (5) his position remained open or he was replaced. *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017) (citation omitted).

Here, because Kyle couches his claims of disability discrimination under the ADA using circumstantial evidence, we analyze his claims using the *McDonnell Douglas* burden-shifting framework. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). If Kyle establishes a prima facie case, the burden shifts to Norfolk Southern to articulate a "legitimate, nondiscriminatory reason" for the adverse employment action. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003); *McDonnell Douglas*, 411 U.S. at 802. The burden will then shift back to Kyle to show that the purported nondiscriminatory reason was actually "a pretext designed to mask discrimination." *Wexle*, 317 F.3d at 574 (citation omitted). Because Kyle asserts his claims under the ADA, his disability must also be a "but for" cause of Norfolk Southern's adverse employment determination. *Arthur v. Am. Showa, Inc.*, 625 F. App'x 704, 707 (6th Cir. 2015); *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306 (6th Cir. 2016). Here, the parties contest only the fourth element: whether Norfolk Southern knew or had reason to know of Plaintiff's disability. Doc. 18-1, PageID 272; Doc. 20, PageID 309.

*1. Relevant Decisionmakers & Cat's Paw Liability*

Before addressing whether Norfolk Southern had notice of Kyle's disability, the Court first determines which individuals were the relevant decisionmakers. This initial determination is critical because "existing case law makes clear that an employee cannot be considered to have been fired 'on the basis of disability' unless the individual decision-maker who fired the individual had knowledge of that disability." *Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 368 (6th Cir. 2013); *Burns v. City of Columbus, Dep't of Pub. Safety, Div. of Police*, 91 F.3d 836, 844 (6th Cir. 1996).

Here, Division Superintendent Stinson and General Manager Barner were the decisionmakers responsible for Kyle's termination. On February 11, 2022, Stinson recommended in an email to Barner and other company employees that Norfolk Southern terminate Kyle's employment because of his "lack of integrity," his failure to investigate the injury involving Conductor Nicodemus, and his "extremely late reporting" of the incident and injury. Doc. 17-22, PageID 251–52. Barner supported Kyle's dismissal. *Id.* (stating "[n]ot only did [Kyle] fail to investigate said injury, he failed to escalate to his supervisor and failed to report the injury as we are required to do when it was 1st reported on 1/27 . . . I support dismissal in this case"). Thereafter, on February 15, 2022, Kyle received his termination letter, which was signed by Division Superintendent Stinson. Doc. 17-23. The letter stated that his employment would be "effective immediately." *Id*. These facts show that Stinson and General Manager Barner were the individual decision-makers who ultimately made the decision to terminate Kyle's employment from Norfolk Southern. *See Nilles*, 521 F. App'x at 368.

To the extent Kyle attempts to invoke the cat's paw theory based on Terminal Superintendent Andrews's role in the Nicodemus investigation, that theory fails. *See Staub v.*

*Proctor Hosp.*, 562 U.S. 411, 423 (2011). Notably, "the term 'cat's-paw' refers to 'one [who is] used by another to accomplish his purposes." *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006) (citations omitted). More specifically, "'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 377 (6th Cir. 2017) (citation omitted). Following from that, courts consider whether the manager's actions were "motivated by hostility" and whether the manager had the "specific intent" to cause an adverse employment action against the employee. *Staub*, 562 U.S. at 423.

The record here does not support such a finding. First, Division Superintendent Stinson went to Middletown himself, actively participated in the investigation regarding Conductor Nicodemus' injury, and interviewed Conductor Nicodemus before recommending Kyle's dismissal to General Manager Barner and other company employees. Kyle Dep., Doc. 17-1, 161:10–13; 163:12–21; Doc. 17-22, PageID 251–52. In addition, Kyle's own participation in the Nicodemus investigation, along with the involvement of other managers, weakens the claim that only Terminal Superintendent Andrews caused Kyle's termination. Doc. 17-24; Doc. 19-3. More importantly, the record contains no evidence that Andrews acted with discriminatory animus or used the Nicodemus investigation to ultimately cause Kyle's termination. Although Andrews participated in the Nicodemus investigation (which suggests that Andrews may have had an ounce of influence on the outcome), cat's paw liability requires a more specific showing: that Andrews acted with discriminatory animus and deliberately sought to *cause* Kyle's termination. *Staub*, 562 U.S. at 423.

Here, Norfolk Southern's supposed rationale for Kyle's termination was that Kyle failed to report and properly investigate a *reportable* employee injury. *See* Doc. 17-22. Even if Andrews drafted the final investigation report and Division Superintendent Stinson simply signed it, the report labels the Nicodemus incident as "non-reportable." Doc. 19-3; Doc. 20, PageID 307. Had Andrews intended to cause Kyle's discharge, he would have had little reason to label the Nicodemus incident as "non-reportable." *See Staub*, 562 U.S. at 423. This evidence materially weakens Kyle's cat's-paw theory because it fails to suggest that Andrews acted with the "specific intent" to cause Kyle's termination. *Id*. Accordingly, the Court considers whether Division Superintendent Stinson or General Manager Barner—the relevant decisionmakers—knew or had reason to know of Kyle's disability when Norfolk Southern terminated him.

*2. Prima Facie Case*

There is a long-standing principle in ADA law that "[a]n employer has notice of [an] employee's disability when the employee tells the employer that he is disabled." *Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 737 (6th Cir. 2015) (quoting *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999)). Indeed, from a practical perspective, "unless the [employer] knew or believed that the plaintiff was disabled, or knew that the symptoms were caused by a disability as defined by law, it would be impossible for the [employer] to have made its decision *because of* the [employee's] disability." *Yarberry*, 625 F. App'x at 737 (citation omitted). Therefore, the employer must "know enough information about the employee's condition to conclude that he is disabled. Relevant information could include, among other things, a diagnosis, a treatment plan, apparent severe symptoms, and physician-imposed work restrictions." *Cady v. Remington Arms Co.*, 665 F. App'x 413, 417–18 (6th Cir. 2016) (internal

citation omitted) (noting that there is not likely sufficient notice "[i]f the sole evidence of notice [is] a vague assertion of concern").

This general principle, however, must be paired with the recognition that an employee is not required to plainly use the word *disabled* to place his employer on notice as to his disability. Because an employer, of course, is "on notice of a disability if an employee's symptoms are 'severe enough to alert' it," which provides the employer with "either knowledge or 'some generalized notion' of the [employee's] disability." *Yarberry*, 625 F. App'x at 737 (quoting *Nilles*, 521 F. App'x at 369); *see also Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 934 (7th Cir. 1995) ("[I]t may be that some symptoms are so obviously manifestations of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability."). The Court first addresses whether Division Superintendent Stinson knew or had reason to know of Kyle's disability, then turns to the facts bearing on General Manager Barner's knowledge.

*a. Stinson – Division Superintendent*

The record is insufficient for a reasonable jury to find that Stinson knew or had reason to know that Kyle had a disability. Kyle, however, argues that Stinson knew or had reason to know of his disability because Stinson was on notice that Kyle took a medical leave of absence for his own health condition for about six months. Doc. 20, PageID 311. The basis of Kyle's argument is formed by two email notices Stinson received on September 13, 2021, from the company's FMLA Coordinator. Docs. 19-4, 19-5. The first notice (Doc. 19-4) has a subject line that says, "Benefit Exhaust" and advised Stinson that Kyle's "protected leave entitlement for [his] leave of absence . . . [would] exhaust under the . . . Family and Medical Leave Act on 9/16/2021" and that no response by Stinson was required. The second email, with the

subject line "Continuous-Family Medical Leave Determination," provided that Kyle's 12-week leave request had been approved for a "Serious Health Condition" for "Self." The email further again stated that no response to the email was required. Doc. 19-5. Kyle also relies on testimony from Terminal Superintendent Andrews where he stated the following:

> **Q** Who was there to inform you that, for example, Mr. Kyle was on a leave of absence? . . . So who -- who is that, that passes on that knowledge?
>
> **A** Would have been ultimately like the division sup. I'm sure several people mentioned it to us. But I know Dave Stinson would have; he's the division sup -- superintendent.

Andrews Dep., Doc. 17-7, 19:19–25; 20:1–5.

Andrews' vague deposition testimony suggests only that Stinson *may* have had some generalized knowledge about Kyle's leave of absence, which is insufficient. Importantly, the central question at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020) (citation omitted). Here, it is the latter. The Sixth Circuit has made clear that "[a] prima facie case is not made out if the decisionmaker is unaware of the specifics of an employee's disabilities or restrictions, *even* if the decisionmaker has a general knowledge that a disability exists." *Tennial*, 840 F.3d at 306 (emphasis added). In the same vein, the two generalized leave notices did not give Stinson sufficient information to conclude that Kyle was disabled because the evidence does not show that Stinson was aware of any specifics as to Kyle's condition. *Arthur*, 625 F. App'x at 708; *Nilles,* 521 F. App'x at 369.

Though the second notice provides that Kyle was taking continuous leave for "Self" for a "Serious Health Condition," an employer "[k]nowing that an employee has health problems, . . . is not the same as knowing that the employee suffers from a disability." Doc.

19-5; *Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp. 2d 814, 829 (S.D. Ohio 2004); *see also Nilles*, 521 F. App'x at 369 ("Knowledge of an employee's symptoms, . . . does not necessarily equate to knowledge of his disability.") (holding that the decisionmaker's knowledge of two medical leaves, medical appointments, and MRI was insufficient to establish knowledge of a disability).

Notably, the two notices here did not disclose Kyle's diagnosis, did not suggest that he was hospitalized or endured emergency intervention at any point, did not reference any medical treatment he received, did not describe a treatment plan, or list any of Kyle's symptoms. *See* Docs. 19-4, 19-5. The notices did not include any communications from Kyle's health-care provider and did not include any physician-imposed work restrictions, which taken together fell well short of putting Stinson on notice that Kyle suffered from a *disability*, as opposed to having a vague understanding that Kyle was undergoing some generalized health issue. *Cady*, 665 F. App'x at 418 (noting that there is not likely sufficient notice "[i]f the sole evidence of notice [is] a vague assertion of concern"); *but see Yarberry*, 625 F. App'x at 738 (holding that the employer had reason to know of mental illness where, before the termination decision, the decisionmaker knew the plaintiff's fiancée believed he required hospitalization; the plaintiff had displayed bizarre behavior and sent irrational texts and emails; he could not carry on a rational conversation; he had passed a drug test; and he was later hospitalized psychiatrically).

Beyond this point, Kyle had previously taken medical leave for a broken foot. Given that history, the notices' reference to medical leave did not tell Stinson that Kyle's leave absence was related to diabetes (his disability) rather than to his prior foot injury. Kyle Dep., Doc. 17-1, 66:9–12; 92: 9–23. And when Kyle returned to work, Norfolk Southern Health

Services informed his supervisors that he was medically qualified to return *without* restrictions. Doc. 17-20, PageID 249. Even more, Stinson testified that he routinely received similar FMLA notices concerning other employees and would quickly forward the notices to the employee's current manager or supervisor for informational purposes:

> **Q** And this is an email you received from, it looks like a -- a sort of a generic email, FMLA Coordinator. And it says that it indicates that Joe Kyle was on -- on leave, FMLA leave?
>
> **A** Yeah. I received probably numerous of these emails. All I would do is flip that email or forward the email to that individual's current manager just as information. That's between medical and him, and I would just send them as I received them.

Stinson Dep., Doc. 17-3, 16:14–22.

Here, too, Kyle testified that he never once discussed his diabetes with Stinson and had no basis to believe Stinson even knew of his condition. Kyle Dep., Doc. 17-1, 114: 4–10 ("**Q** Did you have any specific conversations with Mr. Stinson related to your diabetic condition at any time? **A** Not that I recall. **Q** Do you have any reason to believe that Mr. Stinson knew that you had diabetes? **A** I have no way of knowing that."); *see Messenheimer v. Coastal Pet Prods., Inc.*, 764 F. App'x 517, 519 (6th Cir. 2019) (stating that the plaintiff was unable to show that the defendant knew or should have known she was disabled when her managers "testified that [the plaintiff] never told them about her Meniere's diagnosis"). The notices therefore provided Stinson with, at most, a vague indication that Kyle had some health-related concern; they did not give Stinson any knowledge of Kyle's disability. Accordingly, the record does not support a finding that Stinson knew or had reason to know of Kyle's disability. The Court therefore turns to the evidence concerning Barner's knowledge.

*b. Barner – General Manager*

In General Manager Barner's case, the record fails to demonstrate that he had any knowledge of Kyle's medical condition. Kyle neither alleges nor offers evidence that Barner knew Kyle took leave for his own serious health condition, received the FMLA or continuous-leave notices, or knew of his diabetes or any medical restrictions. The only evidence of Barner's involvement in Kyle's termination was his support of Stinson's recommendation to dismiss Kyle for failing to investigate, escalate, and report Conductor Nicodemus's injury. Doc. 17-22, PageID 252. No reasonable jury could infer that Barner possessed any disability-related knowledge regarding Kyle's condition from this record.

Because Kyle has not established a prima facie case of disability discrimination, the Court need not consider whether Norfolk Southern has articulated a legitimate, nondiscriminatory reason for his termination or whether that reason was pretextual. Accordingly, Norfolk Southern's Motion for Summary Judgment is granted as to Kyle's disability discrimination claim. The Court next addresses Kyle's claim that Norfolk Southern failed to reasonably accommodate his disability.

**B. Failure to Accommodate**

The ADA directs an employer to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability. . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A); *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018). For this claim, Kyle alleges that Norfolk Southern terminated him "because of his leave of absence," which denied him a reasonable

accommodation."[2] Doc. 20, PageID 320–21. Norfolk Southern disagrees. "To succeed on his failure-to-accommodate claim, [Kyle] must show: (1) he is disabled; (2) he is otherwise qualified for [his] position, with or without reasonable accommodation; (3) [Norfolk Southern] knew or had reason to know of his disability; (4) he requested an accommodation; and (5) [Norfolk Southern] failed to provide the necessary accommodation." *Arthur*, 625 F. App'x at 709 (citing *Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 407 (6th Cir. 2014). Here, the *McDonnell Douglas* burden-shifting framework does not apply because "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination." *Brumley,* 909 F.3d at 839 (citation omitted). Instead, in failure-to-accommodate cases, the plaintiff's claims are subject to a different type of burden shifting test.

Once the plaintiff establishes that the employer failed to accommodate a known disability, the burden then shifts to the employer to show that the proposed accommodation would impose an undue hardship on the business. *Id.* In addition, once an employee has made a reasonable request "the employer has a duty to engage in an 'interactive process' to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Melange v. City of Ctr. Line*, 482 F. App'x 81, 84–85 (6th Cir. 2012) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007)).

---

[2] As defined under the regulations, "[t]he term reasonable accommodation means: (i) Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or (ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position; or (iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o).

"But if the employee never requests an accommodation, the employer's duty to engage in the interactive process is never triggered." *Id.* at 85.

Norfolk Southern contends that Kyle cannot establish the fourth and fifth elements of his failure-to-accommodate claim: that he requested an accommodation and that Norfolk Southern failed to provide one. Doc. 18-1, PageID 276. Kyle bears the burden of showing that he requested a reasonable accommodation. *Aldini v. Kroger Co. of Michigan*, 628 F. App'x 347, 350 (6th Cir. 2015). However, "[o]ur case law establishes no bright-line test for when the form of an employee's request is sufficiently clear to constitute a request for an accommodation." *Judge*, 592 F. App'x at 407. And the Sixth Circuit has historically emphasized that an employee's requests for accommodation may be inferred from the context. *Yanick v. Kroger Co. of Michigan*, No. 23-1439, 2024 WL 1856680, at *4 (6th Cir. Apr. 29, 2024) ("Employers must draw reasonable inferences from what an employee says, bearing in mind the statements' context."). In addition, the Circuit has recognized that the law provides employees with "some flexibility in how they request an accommodation." *Mobley v. Miami Valley Hosp.*, 603 F. App'x 405, 413 (6th Cir. 2015).

For instance, an employee need not use any "magic words," when requesting an accommodation, identify his precise diagnosis, specifically invoke the term "disability," or make a request in any specific form. *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 564 (6th Cir. 2022). And a "plaintiff's own requests, whether written or oral, can satisfy this element." *Id.* Conversely, however, "[t]he employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation," and vague requests for an accommodation will not suffice. *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046–47 (6th Cir. 1998).

Here, a jury could conclude that Kyle requested an accommodation from Norfolk Southern on more than one occasion and that the company failed to accommodate him. Kyle testified that, shortly after returning to work following his six-month medical leave, he asked Terminal Superintendent Andrews for help at night so that he could obtain proper rest:

> **A** When I went back to work, I had asked for help to be scheduled at Middletown, et cetera, et cetera. None was provided. This is days after I had come back to work. I believe I called Mr. Hershiser and Mr. Andrews about getting some help up there at night and it didn't happen. It didn't happen.
>
> . . .
>
> **A** The amount of hours I was working up there in Middletown to keep the operation moving was increasing my health decline.
>
> . . .
>
> **Q** Okay. So at some point between 13 January 14 and February 16, it's your testimony that you had a communication with Mr. Andrews where you told him that if you didn't get help at nights, you were going to have to take medical leave. Is that your testimony under oath?
>
> **A** I didn't tell him I was going to take medical leave. I told him I wanted to avoid that; give me some help, so we don't go back down that path . . . the amount of hours required to keep the operation fluid, I was going to -- I was going to go -- we were leaning toward the path of the medical leave again because nothing had changed. I was still up there alone, by myself. . . . I remember requesting help. And I remember sending an email -- I believe it was to Mr. Hershiser -- not long after, you know, those conversations about, I'm afraid we're going to end up in the same position again, if we don't get some help up here.

Kyle Dep., Doc. 17-1; 99:5–11; 100:2–5; 103: 12–25; 104:10–15; 102:2–9. Kyle testified further that he told Terminal Superintendent Andrews and Kyle's immediate supervisor, Hershiser, on at least three occasions that he needed help or relief at Middletown so that he could get adequate rest and avoid returning to medical leave. *Id.* at 106: 16–25 ("**Q** [H]ow many times did you make that statement, "I need help so that I can get proper rest so that I don't have to go out on medical leave"? How many times did you make that statement? **A** I would say at least three, maybe three to five times. **Q** Three to five times? **A** Yes.").

In turn, Kyle contends that Andrews generally responded that the company would see what they could do and that he would try to find someone to assist Kyle at Middletown. *Id*. at 110:8–14. However, Kyle contends that the company failed to provide him with any assistance. *Id*. at 110:20–25. The relevant inquiry here is whether Kyle's statements, in their context, reasonably informed Norfolk Southern that he needed an adjustment because of his disability. *Yanick*, 2024 WL 1856680, at *4 (addressing the importance of "whether the employee communicated a need for an adjustment at work because of a disability").

Considering Kyle's requests in context, as we must, his communicated concerns and requests for additional support at Middletown came shortly after Kyle's return from about six months of medical leave for his "Continuous" and "Serious Health Condition"; his requests were directed to both Terminal Superintendent Andrews and Kyle's immediate supervisor, Hershiser; Kyle expressly referenced the need to avoid returning to medical leave so that he would not "end up in the same position again" and he specifically used the term "medical leave," which sufficiently tied his requests to his medical concerns. Doc. 19-5; Kyle Dep., Doc. 17-1; 99:5–11; 100:2–5; 103: 12–25; 104:10–15; 102:2–9; *see Yanick*, 2024 WL 1856680, at *4. This is sufficient. As noted, the Sixth Circuit has recognized that the law provides employees with "some flexibility in how they request an accommodation." *Mobley*, 603 F. App'x at 413. Here, one could reasonably understand Kyle's comments as requests for additional break time, assistance from a supervisor during shifts, or a modified work schedule to enable Kyle to continue working without returning to medical leave as a result of his disability.

Conversely, the Court recognizes that Kyle's physician had previously released him back to work *without* restrictions and that Terminal Superintendent Andrews received notice

of that release. Doc. 17-20, PageID 249. This means that Andrews could have reasonably understood Kyle's later requests for support as just ordinary requests for additional staffing, rather than requests for accommodation related to his disability. *Id.*; Doc. 17-19, PageID 248. But *Yanick* directly addresses that argument. *Yanick*, 2024 WL 1856680, at *5. There, as here, the plaintiff returned from medical leave without restrictions. *Id*. The employer argued that it could therefore assume that the plaintiff was "fully fit for work." *Id.* The Sixth Circuit agreed that the defendant could *initially* treat Yanick as fully fit to work because, indeed, she returned to work without any medical restrictions. *Id*. But when Yanick later told her supervisor that she was physically struggling after working long hours and needed time to return to normal, the Circuit held that Yanick properly requested a reasonable accommodation and that her earlier release from work restrictions did not "trump [Yanick's] later indications that she was experiencing difficulties." *Id.*

The same reasoning applies here. Kyle's physician, Katrina Fernandez, released him to return to the office without any restrictions. Doc. 17-19, PageID 248; Doc. 17-20, PageID 249. As a result, Andrews could have reasonably understood Kyle's later requests for support as ordinary staffing concerns. But Kyle testified that he repeatedly asked Andrews and Hershiser for help so that he could get proper rest to specifically avoid returning to *medical leave*. Kyle Dep., Doc. 17-1; 99:5–11; 100:2–5; 103: 12–25; 104:10–15; 102:2–9. If that is the case, which affording all reasonable inferences and construing the evidence in the light most favorable to Kyle, as we must at this stage, Norfolk Southern had a duty to engage with Kyle to determine whether a reasonable accommodation was available. *Melange,* 482 F. App'x at 84–85. This evidence creates a factual dispute as to whether Kyle requested a reasonable accommodation following his return from medical leave. And whether Norfolk Southern

appropriately responded to those (alleged) requests are now questions for a jury. Accordingly, Norfolk Southern's Motion for Summary Judgment (Doc. 18) is denied as to Kyle's failure to accommodate claim.

## III. CONCLUSION

For the reasons stated, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion for Summary Judgment (Doc. 18). The Court grants Norfolk Southern's request for summary judgment as to Kyle's disability-discrimination claim but denies summary judgment as to his failure to accommodate claim under the ADA and Ohio Revised Code § 4112.02. The Court will set this matter for telephonic conference by separate entry.

**IT IS SO ORDERED.**

September 30, 2026

Jeffery P. Hopkins
United States District Judge